UNITED STATE DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

DENNIS J. SOLOMON,
                Plaintiff

        v.                                          Civil Action No.

CHARLES VEST
MIT
LITA NELSON
RAYTHEON, INC.                      MAGISTRATE JUDGE ‾JLA‾
DENNIS PICARD
TELEDYNE, INC.
RICHARD SIMMONS
NATASHA LISMAN
ROBERT LAWLESS
ACTUALITY SYSTEMS, INC.                  RECEIPT #_____
GREG FAVALORA                            AMOUNT $ 150
ROBERT RYAN                              SUMMONS ISSUED YES
THE OFFICE/ELLIS OFFICE SYSTEMS          LOCAL RULE 4.1
TEXAS INSTRUMENTS, INC.                  WAIVER FORM_____
PRODUCTIVITY SYSTEMS, INC.               MCF ISSUED_____
DANA DUDLEY                              BY DPTY, CLK. TOWN
PAUL KILLEEN                             DATE 11/29/04
ALAN MORSE
STEPHEN MINDICH
ORIT GADIESH
MARY WOLFSON
PATRICK E. MALLOY
MICHAEL A. MCMANUS
WERNER ERHARTD/EST/LES
MARK MORDECAI
KEITH LONG
JOHN VINTON
CRAN BARRY, INC.
ROBERT ELLIS
RICHARD PLOTKIN
ALTMAN, INC.
ROBERT GOLDEN
RODNEY GOULD
ELLIE ALTMAN
ROBERT PUJOL
RODNEY GOULD
LIGHTSPACE, INC.
ALAN SULLIVAN
SUNRISE SYSTEMS, INC.
MICROVISION, INC.
RICHARD RUTKOWSKI

1

JOEL KOLLIN
UNIVERSITY OF SOUTHERN CALIFORNIA
SCOTT EDELMAN
JOHN AND JANE DOE 1-10
     DEFENDANTS.



## COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Dennis J. Solomon hereby demands a jury trial and avers as follows:

## PARTIES

### Plaintiff

1.  Plaintiff Dennis J. Solomon is an inventor with a residence in Yarmouth Port, MA. He attended Massachusetts Institute of Technology (MIT) as an undergraduate and the MIT Sloan Graduate School of Management Executive Program in 1988 and 1989. During the 1980's, Solomon developed an advanced three dimensional display with broad applications including medical imaging, air traffic control and missile defense. During 1989, the Secretary of the Navy deemed Solomon's technology of critical importance, and during 1992, a United States Air Force review concluded the architecture was substantially superior to the Defendants' existing technology.

2.  Solomon was a vocal supporter of MIT Professor Theodore Postol – a major critic of Raytheon's Patriot Missile program, and independently involved in a dispute with Raytheon in 1993 over the related system for airspace object identification and missile control. In the matter of Volumetric Imaging, Inc. v Raytheon et al., USDC 97-11817-GAO, Solomon moved [USDC Docket , Paper 38-1, Addendum Exhibit 2] to modify the protective order for the sole purpose of presenting information related to the deficiencies in Patriot control system in camera to the select United States Senate Armed Services committee. Judge O'Toole denied the motion on June 3, 1998. Implementation of the recommendations would have prevented the "friendly fire" deaths of three coalition pilots. [See Exhibit One]. As a result of the success of Solomon's inventions, his inventions and economic efforts have been drawn into this economic, political and actual war between the corrupt Defendants and various governments and agencies.

### Defendants

3.  Defendants are members in an ongoing corrupt organization engaged in unlawful schemes to defraud the United States, endanger its citizens, and unlawfully interfere with the interstate commercial activities of the Plaintiff and others. All the defendants are directly connected though the Atlantis Weathergear persons, including former Assistant to President Reagan Michael McManus, their interstate banking and medical activities, or their investments in MIT 3D holographic and display technology.

2

4. Defendant Charles Vest is a politically active administrator and holographer without any significant patents or other leading technological achievements. From 1968 to 1990 he was associates with the University of Michigan. From 1990 to the present, he has been employed by M.I.T. as president. On June 27, 1990, MIT Tech Talk published the MIT Collective investigation of Vest as "very political …a Teflon administrator … [and] nebish technocrat". He knowingly and criminally received bribes and promises of future employment in consideration for mounting an attack on the credibility and attempting the entrapment of MIT Professor Theodore Postol.

5. Defendant Massachusetts Institute of Technology (MIT) is a non-profit, educational institution. In 1990 and 1991, MIT licensed two unclaimed patents issued in 1980 and 1987, respectively, to Solomon for the remainder of their term.

6. Defendant Teledyne is believed to be a Delaware corporation with offices in Massachusetts, New Hampshire, and California.

7. Defendant Richard Simmons has been employed as in the administration of the Teledyne companies as President.

8. Defendant Microvision, Inc. is believed to be a Washington corporation with office in Seattle, Washington.

9. Defendant Richard Rutkowski has been employed as in the administration of the Microvision, Inc. of the State of Washington as President. Previously, he was an officer of Data Display Corporation of Dallas, TX. Rutkowski paid $200,000 to Defendant Sunrise to obtain Solomon's trade secrets.

10. Defendant Joel Kollin claims to be the original patentor associated with Microvision, Inc. He previously studied at MIT under Stephen Benton where he was acquainted with agents of Morse. He is also believed to have worked with Adam Weinberg, formerly of Reebok on advertising displays. Kollin received detailed information regarding Solomon's inventions from parties' associates with Hahn, Morse and others.

11. Defendant Alan B. Morse is a former President of U.S. Trust Company of Boston, president of Harvard Community Health Plan during its bankruptcy, and Massachusetts banking commissioner doing the investigation of U.S. Trust Company. Morse was presented at meeting in 1982 where Solomon presented his HoloDeck Volumetric technology. From 1982 to the present, he has conspired with the Defendants including his niece and nephew, Katherine and Robert Hahn, children to the late Yale Mathematics Professor Otto Hahn, to obtain and convert Solomon's trade secrets.

12. Defendant University of Southern California is a non-profit, educational institution. It does not manufacture or sell 3D displays. USC, with no direct standing or financial interest, knowingly and willfully conspired with the other Defendants to unlawfully opposed the grant of the trademark HoloDeck when they know or should have known that a majority of its relevant staff had no prior recognition of the trademark, and amended for the unlawful purpose of obtaining Solomon's trade secrets and to interfere the business relations of Solomon.

13. Defendant Scott Edelman is believed to be an attorney with the firm Gibson, Dunn and Crutcher, representing Teledyne and USC.

14. Defendant Actuality Systems, Inc. is believed to be a Massachusetts corporation with office in Burlington, MA.

15. Defendant Robert Ryan is believed to be the principal financier and Chairman of the Board of Actuality Systems, Inc. Prior to Actuality he was employed by Digital Equipment, Inc. and founded Ascent.

16. Defendant Greg Favolora is believed to be a resident of Massachusetts and a founder of Actuality Systems, Inc. While a student at Yale, he received information from associates of Morse regarding Solomon's inventions and pending patents. He fraudulently claimed and promoted Solomon's technology as his own.

17. Defendant Lightspace Technologies, Inc. (hereinafter referred to as "Lightspace") is believed to be a foreign corporation with employees and agents in Massachusetts and offices in Connecticut and Sweden.

18. Defendant Alan Sullivan is believed to be a founder and employee of Lightspace. Sullivan knowingly conspired with Texas Instruments, Inc. to mislead the relevant consumers regarding the origin and invention of technology developed by Solomon by fraudulently conveying, suggesting, supporting and funding an MIT thesis project incorporating Solomon's technology.

19. Defendant Raytheon is believed to be a Massachusetts corporation with offices in Waltham, MA.

20. Defendant Dennis Picard has been employed during the relevant period as president of the Raytheon.

21. Defendant Stephen Mindich of Newton, MA is believed to be the owner of the Boston Phoenix (formerly Boston After Dark), a Boston tabloid, husband to former Judge Maria Lopez and a close friend of Mary Wolfson. In the early 1970's, Solomon supported Mindich's competitors, the Cambridge Phoenix and the Real Paper. Since the 1970's, Mindich has maintained a dossier on the drug use of Boston area students, especially at Harvard's Law and Business Schools, and used the Atlantis cartel to provide drugs to politicians, judges, rock stars, and other personalities.

22. Defendant Mary Wolfson of Boston, MA is believed to be a close friend and business partner of former Judge Maria Lopez and Stephen Mindich. In 1995, Wolfson introduced herself to Solomon at a seminar on the Israeli evaluation of the Patriot Missile.

23. Orit Gadiesh is believed to be a close friend of Stephen Mindich and Maria Lopez, and the former president of Bain and Company. In 2004, Gadiesh failed to respond to a written request for clarification by Solomon. Gadiesh is believed to have used her Bain and personal contacts to unlawfully conspire to obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

24. Sunrise Systems, Inc. (hereinafter called "Sunrise") is believed to be a Massachusetts corporation manufacturing LED signs. During the 1990's, Sunrise manufactured HoloDeck Volumetric Displays and other experimental items for Solomon.

25. Defendant Michael A. McManus, Jr. is believed to have been born in Boston, MA and regularly visits the Commonwealth of Massachusetts. In 1976, McManus, an attorney, counseled his close friend, Patrick E. Malloy III in the unlawful freeze-out the Solomon and other minority shareholders in Atlantis Weathergear, a company Solomon founded. During the period from 1975-1977, McManus was special counsel to Rogers Morton, Secretary of Commerce and a Maryland boat builder. McManus has been identified as a principal player in the Inslaw software scandal involving the murder of Daniel Casolaro.

26. Patrick E. Malloy III is believed to be a resident of Southampton, N.Y. and the developer of Malloy Wharf in Sag Harbor. During the 1980's, Malloy was a major participant in the famous Amazon Club, a nightclub on Malloy Wharf, owned in part by Preston Powell, grandson to Congressman Adam Clayton Powell.

27. Mark Mordecai, raised in Newton, MA was a shareholder of Atlantis and operated the Atlantis Cartel for Malloy, a major narcotics trafficking operation involving Palestinian, Pakistani, Moroccan, and Malaysian operatives. In 1985, he instructed his parents, Herbert and Eileen Mordecai to move to Yarmouth Port, MA, less than 1 mile from a summer residence of Solomon.

28. Productivity Systems, Inc. is believed to be a Texas corporation, a wholly-controlled, subsidiary of Texas Instruments, Inc. and during the relevant period, the TI required source for the Discovery products.

29. Dana Dudley is believed to an employee of Texas Instruments, Inc. responsible for the Discovery DMD program.

4

30. Altman Stage Lighting Company (hereinafter called "Altman") is believed a New York corporation engaged in the manufacture and sale of lighting fixtures for stage, theater, television and the music industry.

31. Elle Altman is believed to be an owner of Altman.

32. Roger Pujol is believed to be an employee of Altman.

33. Werner Erhard is believed to be a foreign resident and during the relevant period conspired and directed his disciples and associates in EST and Landmark to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

34. Landmark Educational Corporation is believed to a wholly control corrupt organization of Erhard and a conspirator to unlawfully obtain the trade secrets of, professionally disparage and interfere with the prospective business relations of Solomon.

35. John and Jane Doe 1-25 are believed to be co-conspirators and agents of the Defendants.

36. The "Atlantis Cartel" is an ongoing corrupt organization engaged in interstate narcotics trafficking, and the interference with interstate commerce by acts of violence, intimidation, theft, and destruction of property in violation of 18 USC 1961 et al.    The criminal organization evolved from the merger of the Mordecai cartel of the late 1960s involving the trafficking of hashish from Morocco through Palestinian and Lebanese affiliates, and the Malloy/McManus cartel trafficking heroin from Southeast Asia in the mid-1970s.  The principal trafficking parties, Mordecai, Malloy, McManus, Altman, Werner Erhard, and Mindich have known each other for decades. The principal industrial parties came together after McManus, former Assistant to President Reagan, and Malloy participated in the Aga Khan's Sardinia Cup sailboat race in 1980, and financed in part the Center for Islamic Architecture and the Media Lab at MIT.  McManus has been implicated in the PROMIS scandal by former Attorney General Elliot Richardson, once his superior at the Commerce Department, and the unlawful misappropriation of U.S. funds to billionaire Rafik Hariri, former prime minister of Lebanon.  In the late 1980's, members of the Atlantis Cartel were indicted and convicted of trafficking over $700 million dollars in hashish from Pakistan to the northeast United States.

## NATURE OF ACTION

37. In this action, Solomon seeks a declaratory judgment of patent noninfringement, invalidity, and unenforceability of the herein named United States Patents pursuant to the Declaratory Judgment Act, 28 U.S.C. §5 2201-02, and the Patent Laws of the United States, 35 U.S.C. 100 et seq., and such other relief as the Court deems just and proper.

38. This action also seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes and redress for fraudulent schemes to steal trade secrets, interfere with present and future beneficial relationships, other unfair business practices, injure to Solomon's business and property,  and such other relief as the Court deems just and proper.

39. Solomon also avers that the Defendants, knowingly and fully aware of the consequences, engaged in a conspiracy and ongoing interstate, criminal enterprise ("the Atlantis Cartel") of interference with government research, contracting and acquisition, and the unlawful acts against and intimidation of competitors by violence, theft mail and wire fraud.  This acts directly resulted in the criminally negligent murder of three U.S. and British coalition pilots by Raytheon's Patriot missiles in 2003, (reported in the CBS 60 Minutes presentation the deaths of at least 14 U.S. National Guard in Saudi Arabia in 1991, and attempted entrapment of MIT Professor Theodore Postol, and former CIA Director John Deutch. Solomon seeks a permanent injunction prohibiting the Defendants from engaging in further unlawful schemes, conspiracies, entrapments, violence and threats of violence and redress for injure suffered to his business and property.

## JURISDICTION

40. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. § 2201-02 and 28 U.S.C. § 1331, 1332 and 1338(a).

## VENUE

41. Venue is proper in this judicial district under 28 U.S.C. § 1391, 1965. Personal jurisdiction exists in Massachusetts over MIT, Raytheon, TI, Teledyne, Actuality Systems, Vest, Picard, Favalora, Altman and other defendants by virtue of residence in or substantial commercial contact with this District.

## BACKGROUND

42. Exhibit 1 is a true and accurate copy of the transcript of a CBS 60 Minutes presentation,

43. During the early 1970s, the Plaintiff Solomon was employed by EMS, Inc. (Eastern Mountain Sports, Inc.) in various capacities including at times as Director of Research, Design, & Development, Director of Advertising, and Boston Store Co-Manager. As Director of Advertising, Solomon supported the Cambridge Phoenix newspaper as opposed to Boston After Dark, owned by Stephen Mindich. In the battle after Mindich's purchase of the Phoenix, Solomon supported its competitor, the Real Paper. Solomon's partner in Atlantis Weathergear, defendant Mordecai, supported Mindich.

44. As Director of New Products, Solomon visited Grand Rapids, MI to develop down products manufacturing – a project which came to the attention of Congressman Gerald Ford. Solomon left EMS in 1973 to found Atlantis Weathergear – whose designs received accolades from the America's Cup teams in 1974. Atlantis products were manufactured by Alb, Inc., a Somerville, MA police, fire coat and L.L. Bean outerwear manufacturer with friendly ties to the Winter Hill mob of Whitey Bulger, and Monsoon, Inc. of Richford, Vermont, an outerwear manufacturer with ties to Space Research Company owned by "Super gun" scientist, Gerald Bull. Atlantis' success came to the attention of Michael A. McManus, Boston born attorney who was special counsel to Ford's Secretary of Commerce, Rogers Morton, also a boat builder from Maryland, and then Elliot Richardson. McManus's close friend and partner, Patrick E. Malloy III, approached Atlantis to anchor a marine wharf development in the center of Sag Harbor, N.Y. Malloy subsequently invested in Atlantis.

45. During the fall of 1975, defendants Malloy, McManus, and Mordecai devised a scheme to freeze-out Solomon. Timothy Davis of Stowe, VT, the general manager of Atlantis at the time, was a Harvard Business School classmate of the present President George W. Bush. At a special stockholder's meeting called by Malloy and Mordecai on January 19, 1976, Davis reported that the company was during extremely well: growing at 400% and showing its first profit. Malloy, contradicted Davis, and claimed the company was in "dire straits" and threatened to call short term demand notes due him secretly executed by Mordecai and Malloy two months earlier to replace revolving inventory and receivables bank financing. When Solomon asked that the meeting be suspended for 10 days for an accounting, Malloy objected and with Mordecai's vote, sold all the assets to himself. Litigation ensued, and Solomon's expert witness, MIT Sloan Professor Michael van Breda testified that the company was a typical "successful start-up" with sufficient resources to continue without additional financing for at least 6 months. The Court found for Solomon and stated that the sale of assets "displayed itself as a badge of fraud."

46. Following the "freeze-out" of minority shareholders in Atlantis, Solomon returned to MIT and the Marine Biological Laboratories in Woods Hole, MA, where he studied marine biology.

47. Malloy, through his sister-in-law, contacted defendant Werner Erhardt, founder of EST and Landmark Educational Associates. Acting through a number of post-doctoral scientists at the Marine Biological Laboratories, Erhardt invited Solomon to attend with 1980 America's Cup aboard the flying bridge of famed yachtsman, Richard "Dick" Bertram. Solomon attended and an intellectual fight ensued with Erhardt.

48. At the time, Solomon was consulting to CB Sports, Inc. of Bennington, VT, a skiwear manufacturer with close ties to the Portillo Ski Resort in Portillo, Chile. The operational executive, Wayne Wetzel, a Harvard Business School graduate from Warwick, RI, maintained close ties to Raymond Patriarca, Jr., a son of the RI Mafia head. Following the success of Solomon's designs at the 1980 America's Cup, Wetzel unilaterally repudiated the royalty provision of the contract.

## The Atlantis Cartel

49. From 1973 to the present, Mordecai, and later Malloy, McManus, Kollin, Wetzel, Vinton, Plotkin and other persons, conspired in an ongoing criminal narcotic enterprise for personal enrichment including the importation of substantial amounts of hashish through Lebanon and Morocco, and, continuing during McManus's employment as Assistant to the President of the United States from 1982-1985, exchanging arms for drugs and currency support of anti-Soviet mujhadden in Afghanistan including Usama Bin Laden. From 1988 to the present, the Defendants have engaged in narcotics trafficking with U.S.-based Israeli, Palestinian, and Egyptian terrorists, including Yonkers, NY World Trade Center bombers, Mohammed Saleh, Ramzi Yosef, and Khalid Mohammed.

50. This corrupt enterprise is known as the "Atlantis cartel" and evolved from the Harvard Law School-based enterprise providing recreational narcotics to the Cambridge and Boston colleges through the Boston Tea Party, a nightclub owned by Harvard Law graduate, Circuit Judge Roy Riepen.

51. In order to prevent their indictment, the Defendants double-crossed two of their expendable satellite groups involving Sidney Lewis of Falmouth, MA and Stuart Newton of Jamestown, RI. Both Lewis and Newton were indicted and convicted of narcotics trafficking from Pakistan in excess of $100 million dollars. Principal distribution of said narcotics was through the Amazon nightclub located in the Atlantis complex on Malloy's Wharf, Sag Harbor, New York, the Compass Lounge in Yarmouth, MA, the Boston Phoenix paper distribution, the adjoining Boston Cab Company and other affiliates of the Defendants. Among the individuals indicted were persons appearing in the 1974 Atlantis Weathergear catalog. Following their release, the individuals assembled an extensive dossier on corrupt officials and their associates, including their detailed phone and bank records. Among the individuals named are: Supreme Court Justice Stephen Breyer, Boston lawyer John Rehnquist, and former Massachusetts Judge Maria Lopez.

52. The Atlantis Cartel was also responsible for the entrapment of Vermont Supreme Court Justices Gibson, Hayes and Hill and their subsequent conviction or reprimand.

53. The Defendants also operated an illegal enterprise engaged in the trafficking of cocaine from South America. Distributors included John Zaccaro (the "pharmacist"), son of Geraldine Ferraro, then a student at Middlebury College. Principal method of transport involved ocean tugs employed by the oil industry. Presently, Ferraro remains a corporate director of Goodrich Petroleum, a publicly traded oil exploration company in the Gulf of Mexico, controlled by Defendant Malloy.

54. The Defendants' criminal enterprise entwined itself with the U.S and foreign intelligence communities including the Irish UNFIL soldiers, German, Italian, Russian, Lebanon and Israeli agents. These connections were publicized by activities of the late Attorney General Elliot Richardson following the appointment of a special prosecutor in the PROMIS affair.

Commencing with the indictments of the Atlantis Newton cartel in the late 1980s, the Defendant's systematically double-crossed their collaborators resulting in the deaths of at least five UNIFIL Irish soldiers, numerous Israelis, Lebanese, Canadians and Americans.

55. The Defendants, including McManus, whose activities include the research and development of biological warfare agents and equipment related to cell transformation (cancer) and cardiac arrhythmias (heart attacks), has been implicated in the deaths of journalist Daniel Casolaro, arms scientist Gerald Bull, attorney Barbara Salken, Dutch intelligence officer Sjord Lundberg, and Harvard scientist Dr. J. Morris Weinberg.

56. On or about May of 1997, Solomon advised the FBI that Yonkers-related WTC terrorists were actively involved in continuing narcotics trafficking through the Atlantis Cartel and clubs such as the "Golden Nugget" in Yonkers, NY; interested Ultralight and glider aircraft motors, and developing Boston connections. Khalid Shaikh Mohammed, the disco-loving, North Carolina educated, mastermind of 9/11 was a related member of this wing, with contacts at the Boston Cab Company and in Newton Highlands, MA.

57. On or about May of 1999, Solomon advised the FBI, U.S. Representative Michael Meehan and other government officials of his knowledge and belief that adversaries of the Atlantis Cartel were assembling sophisticated missile guidance modules using Dutch and German electronic components.

58. It is the Plaintiff's belief and opinion that Defendants' criminal acts directed at MIT Professor Theodore Postol has caused the spontaneous involvement of over 80% of the academic, scientific and engineering community to independently devise methods to neutralize the Defendant corporations, Raytheon, Teledyne and Texas Instruments. Historically, among these methods has been the introduction of undocumented exceptions and "back doors" in critical software. The relevant complexity of government operations are described in the novel "Where the Sun Don't Shine" by Fred Wefer and other publications.

59. It is the Plaintiff's belief and opinion that the Mindich and the Atlantis Cartel have maintained dossiers on the recreational narcotic use by public officials, judges and attorneys , especially law students at Boston College, Harvard and Yale, including Allan Desherwitz, Stephen Breyer, John Kerry, Robert Lawless, John Zaccaro, John Buckley, George W. Bush, Jeb Bush, John Rehnquist, Eugene Scalia, William LeBlond and many others, which have been used to unlawfully influence their official actions.

60. It is the Plaintiff's belief and opinion that with the increasing the revenue stream from the narcotics trade falling under European government and intelligence community control, where certain recreational narcotics are legal and widely available, and has resulted in substantial competition for the "Atlantis Cartel". Simultaneously, the independence of the Bush administration has resulted in a substantially reducing the Defendants' ability to intimidate or influence high government officials. Further, the complicated and deadly results of the Defendants' corrupt activities involving the national and international intelligence community, have created a series of dynamic alliances which are systematically assassinating the Defendants and their co-conspirators using the most sophisticated technology available, and planning terrorist activities against the United States including sophisticated cruise missiles armed with bio-terror agents aimed at specific offices.

## Declaratory Judgment: Patents

## COUNT I (RAYTHEON, TEXAS INSTRUMENTS)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

61. Aforementioned paragraphs are incorporated by reference as if stated fully herein.

62. On May 31, 1994, Solomon filed a U.S. Patent Application entitled Three Dimensional Volumetric Display System with Polarizing Enclosure. Figure 11 of said application teaches Solomon's earlier invention of a "system for increasing the control of visual intensities from digital shutter projection devices" wherein digital shutter array is sequentially illuminated by different intensities encoded "in a binary scheme of 1,2,4,8 ...etc A variation is the rotating color shutter on the light source with a binary scheme for each color."

63. The '94 application restates material presented by Solomon to Texas Instruments and Raytheon engineers during the period from approximately March 1990 to June 1993.

64. On December 21, 1994, Raytheon filed U.S. Patent Application 08/360,870, now U.S. Patent 5,903,323 entitled a "Full Color Sequential Image Projection System Incorporating Time Modulated Illumination." Said '323 patent claims a binary modulation system identical to that disclosed to Raytheon by Solomon more than a year earlier.

65. Raytheon had a duty to and intentionally failed to disclose Solomon's identical prior art to the U.S. Patent office during the prosecution of the '323 patent.

66. Raytheon has claimed to Solomon and others that U.S. Patent '323 is valid and enforceable.

67. Solomon has a reasonable apprehension of being subject to a suit for infringement of said patent due to the prior notice of enforceability by Raytheon.


## COUNT II (ACTUALITY)

(Declaratory Judgment Action for a Declaration of Non-infringement, Invalidity, and Unenforceability of Actuality U.S. Patents)

68. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

69. Favalora and Actuality claim to be the true and original inventors of the following inventions: U.S. Patent No. 6,570,681; 6,554,430; 6,512,498; 6,489,961; 6,487,020; 6,183,088

70. Solomon is manufacturing and offering for sale an Integrated HoloDeck Volumetric Autostereoscopic Display and Projector System

71. Actuality has communicated that Solomon's Integrated HoloDeck Volumetric Autostereoscopic Display System infringes on Actuality patents and that it will rigorously prosecute infringers.

72. Solomon believes that the Actuality patents read upon or incorporate his earlier-filed inventions described in his U.S. patent applications filed in 1985 and thereafter.

73. Solomon has a reasonable apprehension that Actuality will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Actuality and Solomon within the meaning of 28 U.S.C. § 2201

74. Solomon has not infringed any valid and enforceable claim of the aforementioned patents, either literally or under the doctrine of equivalents

75. The Actuality patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Actuality had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

76. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

77. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

COUNT III
(MICROVISION, INC., UNIV. OF WASHINGTON, KOLLIN, ET AL)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and
Unenforceability of Actuality U.S. Patents)

78. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

79. From 1984, Solomon disclosed his invention of retinal scanning displays with dynamic accommodation and resonant scanners to staff and faculty at MIT.

80. Joel Kollin was a student at MIT and had access to Solomon's inventions disclosed at MIT including Solomon retinal scanning system. On or about September, 1989, Kollin left MIT for the University of Washington, Seattle.

81. Richard Rutkowski is the president of Microvision of Seattle, WA, a licensor of retinal scanning patents granted to Kollin.

82. Prior to Microvision, during the late 1980s and early 1990s, Rutkowski was an officer of Data Display, Inc. of Texas, a customer of Sunrise Systems, Inc. of Pembroke, MA., whom Rutkowski regularly visited.

83. In the early 1990s, Sunrise Systems manufactured prototypes of LED based experiments for Solomon including retinal scanning displays.

84. Solomon's relevant inventions and experiments were known to Defendants', their staff, employees, faculty, agents and others prior to their filing the relevant patent applications.

85. In 1995, Rutkowski paid Sunrise Systems, Inc. over $200,000 for having provided unlawful access to Solomon's trade secrets related to displays and retinal scanning.

86. Microvision and the University of Washington claim to have the assignment of, or to be the true and original inventors of the following inventions by the Defendants:
6,768,588; 6,762,867; 6,755,536; 6,752,496; 6,734,835; 6,719,425; 6,714,331; 6,710,342; 6,700,552; 6,700,552; 6,687,034; 6,682,192; 6,674,993; 6,661,393; 6,654,158; 6,653,621; 6,650,877; 6,639,719; 6,639,570; 6,612,355; 6,605,805; 6,583,772; 6,563,105; 6,563,105; 6,560,028; 6,538,625; 6,535,325; 6,535,183; 6,525,310; 6,515,781; 6,515,278; 6,512,622; 6,497,649; 6,445,362; 6,433,907; 6,417,502; 6,396,461; 6,392,231; 6,388,641; 6,384,406; 6,369,953; 6,362,912; 6,352,344; 6,331,909; 6,324,007; 6,317,103; 6,294,775; 6,294,775; 6,285,505; 6,285,489; 6,281,862; 6,256,131; 6,250,755; 6,245,590; 6,243,186; 6,220,711; 6,204,832; 6,204,829; 6,196,226; 6,188,832; 6,166,841; 6,157,352; 6,157,352; 6,154,321; 6,151,167; 6,145,986; 6,140,979; 6,097,353; 6,069,725; 6,061,163; 6,049,407; 6,046,720; 6,043,799; 6,008,781; 5,995,264; 5,982,555; 5,982,528; 5,969,871; 5,958,919; 5,903,397; 5,903,397; 5,903,397; 5,719,784; 5,701,132; 5,659,327; 5,596,339; 5,560,360; 5,467,104; 5,171,267.

87. Solomon is manufacturing and offering for sale an Integrated HMD Autostereoscopic Display and Projector System

88. Defendants have communicated that Solomon's Integrated HMD Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

89. Solomon believes that the Defendants' patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

90. Solomon has a reasonable apprehension that Defendants' will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201

91. Solomon has not infringed any valid and enforceable claim of the patents, either literally or under the doctrine of equivalents

92. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed

10

to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

93. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

94. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

## COUNT IV
## (Lightspace)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of U.S. Patents)

95. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

96. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System

97. Defendants have communicated that Solomon's Integrated SS Autostereoscopic Display System infringes on Defendants patents and that it will rigorously prosecute infringers.

98. Defendants engaged in an unlawful scheme to obtain Solomon's trade secrets by causing its employees and associates to apply for jobs with Solomon under fraudulent pretenses.

99. Solomon believes that the Defendants patents read upon or incorporate his earlier-filed inventions described in U.S. patent applications filed in 1990 and thereafter.

100. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

101. Solomon has not infringed any valid and enforceable claim of the Defendants' patents 6,466,185, 6,377,229, 6,100,862, either literally or under the doctrine of equivalents.

102. The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

103. A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

## COUNT V
## (Altman, Pujol, Golden Et Al)

(Declaratory Judgment Action for a Declaration of Noninfringement, Invalidity, and Unenforceability of related Altman Patents)

104. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

105. Solomon is manufacturing and offering for sale an Integrated SS Autostereoscopic Display and Projector System.

106. Altman owns U.S. Patents 6,671,005 and 6,412,972.

107. Solomon has a reasonable apprehension that Defendants will file a patent infringement action against Solomon if Solomon continues to manufacture, sell, and/or use certain of its displays. Therefore, an actual and justiciable controversy has arisen and exists between Defendants and Solomon within the meaning of 28 U.S.C. § 2201.

108.    Solomon has not infringed any valid and enforceable claim of the Defendants' patents, either literally or under the doctrine of equivalents.

109.    The Defendants' patents are unenforceable due to laches and inequitable conduct in its procurement. During prosecution of the Application, Defendants had knowledge of and failed to cite to the Patent Office, relevant publications of Solomon made prior to the filing date of the respective applications, containing material prior art. This constitutes inequitable conduct and renders the patents permanently unenforceable.

110.    A judicial declaration of non-infringement, invalidity, and unenforceability necessary and appropriate in order to resolve this controversy.

## COUNT V
## (Altman, Golden, Gould Et Al)

(Declaratory Judgment Action for a Declaration of Re-assignment of Solomon's Patent and infringement)

111.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

112.    Solomon has been independently involved in concert lighting and effects from the late 1960s.

113.    Solomon is the independent inventor of U.S. Patents 4,958,265, 4,897,770, 4,893,225, 4,811,182, 4,777,568, 4,729,071, 4,706,006 related to lighting systems.

114.    In 1985, Altman principally sold lighting fixtures to traditional stage, theater, film and television customers. During the period from 1984-1990, Solomon entered into a number of contracts, all of which by explicit agreements, differentiated between traditional stage, theater, film, television applications and rock (in the broad context) concert applications.

115.    Altman fraudulently induced Solomon to license and assign said patents to Altman by explicating stating that Altman would bay a royalty of 5% of sales or lease fees, plus the preferred involvement use or equivalent income, on all use, sale or lease of Solomon's inventions for rock concerts, when in fact Altman had no intention to due so.

116.    On or about 1995, Altman unilaterally repudiated said contracts. Thereafter, all use of the Altman fixtures represented the infringement of Solomon's patents.

117.    Said terms of said contracts were not severable.

118.    Thereafter, Altman continued to use Solomon's invention for the rock concert applications including but not limited to the band PHISH. Altman or its agents provided an operator at all such concerts.

119.    On 6/14/2002 and other occasions, Altman used and infringed upon Solomon's inventions by transporting said Altman fixtures to the Tweeter Center in Massachusetts and using same in the performance of the band PHISH.

120.    The minimum damages for each said performance instance of infringement would be $12,000. During the past six years, Altman has infringed at least 400 times.

121.    Robert Golden and Rodney Gould aided and abetted said infringement by intentionally misleading Solomon into believing that said Altman fixtures were not used by the band PHISH.

122.    Altman, Robert Golden and Rodney Gould furthered conspired to damage Solomon's by organizing schemes to obtain Solomon's trade secrets.

123.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## Abuse of Process, Interference with Present and Prospective Commercial Relations, Scheme to Obtain Trade Secrets

### COUNT VI
### (All Defendants, USC, Edelman)

124.    The aforementioned paragraphs are incorporated by reference as if stated fully herein.

125.    On August 23, 1993, Solomon filed a U.S Trademark application for the stylized word "HoloDeck" for 3D display systems. On May 30, 2000, the application was published for opposition and shortly thereafter the Defendant USC filed an opposition on the grounds the term was generic.

126.    USC counsel testified the Dr. Michael Macedonia, the civilian director of the U.S. Army Simulation Lab and principal grantor in the a $50 million U.S. DOD grant to USC, requested that USC filed the opposition so that he and others could form a private corporation in competition with Solomon.

127.    During discovery, a majority of the relevant staff at USC testified that they were unfamiliar with the term prior to their employment at USC.

128.    Thereafter, Defendants USC acting on behalf of certain government officials, Edelman, Lisman, Lawless, Teledyne TI/PSI and Raytheon agreed to conspire to interfere with the business relations of Solomon by inducing TI/PSI to defraud Solomon by falsely claiming full support and an ongoing solution to the Discovery timing problem.

129.    Shortly thereafter, USC filed an amended opposition claiming failure non-use in commerce and additional discovery for all business records.

130.    Defendant Edelman failed to disclose that his firm represents Defendant Teledyne, a direct competitor of Solomon.

131.    The aforementioned Defendants used the process of opposition as an unlawful scheme to obtain Solomon's trade secrets.

132.    The aforementioned Defendants used the process of opposition as to interfere with the ability of Solomon to raise funds and enter into beneficial contracts for his business.

133.    The aforementioned Defendants knew that Solomon has continuously used the mark "HoloDeck" in interstate commerce, including regular exhibiting at the major U.S. computer graphics show held biannually in Los Angles, a few block from USC.

134.    The aforementioned Defendants engaged in said unlawful activities to defraud the U.S. government of at $50 million dollars and endanger U.S. soldiers and citizens by asserting in their request to the U.S. Government for payment of funds that their display technology was the most appropriate when in fact they knew that their technology was defective and inferior to Solomon's.

135.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## Fraud, Conspiracy, Interference with Present and Prospective Commercial Relations, Breach of Contract: All Defendants

### COUNT VI
### (TI, PSI)

(Conspiracy, Interference with Present and Prospective Commercial Relations)

136. The aforementioned paragraphs are incorporated by reference as if stated fully herein.

137. Paragraphs 1 through 40 are incorporated by reference as if stated fully herein.

138. From 1987 to 1994, Solomon corresponded with Texas Instruments, Inc. regarding the applications of TI's DMD digital shutter array. The parties exchanged non-disclosure agreements but no contract ensued at that time.

139. Exhibit 2 is a true and accurate copy of a letter dated February 14, 1991 from Texas Instruments to Solomon regarding the development of his 3D volumetric imaging technology.

140. During the period, Raytheon unlawfully obtained Solomon's trade secrets related to the USAF JSTAR C4I proposal for real-time missile tracking and control. Raytheon, then teamed with TI, and used said technology in its USAF proposal. Solomon protested the project award. As a result, neither TI nor Raytheon would engage in further business with Solomon.

141. At some time in 2002, TI concluded that Solomon's HoloDeck Volumetric technology was superior to its present clients, Actuality and Lightspace. TI's product manager, Dana Dudley invited and induced Solomon to develop his technology using the TI DMD product.

142. Solomon informed Dudley of his previous contacts with TI, and explicitly stated that he (Solomon) would do so only if TI guaranteed full and equal development assistance and pricing in relation to all the other DMD projection competitors.

143. Dudley agreed and explicitly stated to Solomon that TI was interested in fully assisting the development of new and improved technologies using the DMD.

144. A direct result of Dudley's guarantees, Solomon contracted with TI, through its subsidiary, PSI, to construct real-time, triggerable Discovery system with an advertised rate of at least 4 KHz.

145. Solomon paid PSI at least $25,000 for the system and expended at least $50,000 in the direct development of the DMD project.

146. Following the payments, Solomon discovered that the TI/PSI product was defective. He informed PSI and TI of the problem, and both agreed to solve the problem.

147. However, TI and PSI willfully and intentionally delayed providing a solution, refused to release the technical details which would permit Solomon to identify the problem, and made fraudulent and misleading statements regarding the reasons for the delay.

148. As a direct and intentional result, Solomon was unable to conduct business with prospective client Boeing, Daimler-Benz and others. Further Solomon was unable present his system at SIGGRAPH 2003.

149. TI and PSI continued to mislead Solomon during the fall of 2003 and into 2004.

150. On or about June, 2004, PSI employee Becky Bell stated as a result of an internal dispute with TI, it had ordered PSI to close it doors, and required the transferred all its assets to TI.

151. During July 2004, Solomon made demand upon TI for technical assistance or replacement. TI refused, claimed that PSI was a separate company, and that TI is not liable for PSI breach of contract.

152. On or about August 24, 2004, Solomon received a letter from Boston attorney Paul Killeen stating that TI has requested that "any further correspondence about TI and/or its products" be directed to him.

153. Shortly thereafter Solomon communicated with Killeen and requested the name of the authorizing party at TI. Killeen refused to provide said information.

154. As a direct and intentional result, Solomon was unable to present his system at SIGGRAPH 2004 and future events..

155. During the period from July 2003 to the present, Solomon was substantially damaged by the willful and intentional fraudulent inducement and breach of contract, by TI/PSI in an amount in excess of $50,000.

156. During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to obtain trade secrets in an amount in excess of $50,000.

157.    During the period from July 2003 to the present, Solomon was substantially damaged by TI/PSI scheme to interfere with business relations in an amount in excess of $50,000.

158.    From August, 2004 to present, Solomon's professional reputation was damaged by TI and Killeen's false statements to representatives of MIT and other public figures.

159.    TI and Killeen engaged in the aforementioned unlawful behavior in conspiracy with the other Defendants to defraud the armed services and agencies of the United States by knowingly promoting inferior products for critical defense, security and medical applications.

160.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT IV
## (TI, TELEDYNE, LISMAN, LAWLESS, MIT, VEST, RAYTHEON, ACTUALITY, LIGHTSPACE)

(Fraud, Bribery, Conspiracy, Scheme to Obtain Trade Secrets, Interference with Present and Prospective Commercial Relations, Commercial Disparagement)

161.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

162.    From 1989 to the present, Teledyne, Raytheon, Texas Instruments, Actuality and Lightspace engaged in an unlawful conspiracy to interfere with the interstate commerce of Solomon by fraudulently inducing Solomon, individually, or in his executive capacity, to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires, intentionally breaching or repudiating said contracts, and disparaging Solomon's business reputation.

163.    In a first instance, MIT offered Solomon an exclusive license for the Kollin patent, Teledyne offered to manufacture the components, but, when success was insured which would have removed Raytheon from competition, Teledyne breached said contract by supplying defective, uncertified components, and MIT unilaterally repudiated the license on fraudulent and specious grounds.

164.    Teledyne Technologies, Inc., a 1st tier subcontractor to Raytheon, Inc. for simulation systems for the Patriot Missile.[1]

165.    Richard Simmons was the President of Allegheny Teledyne, Inc., parent company of Teledyne Technologies, Inc. During the relevant period of November of 1999, Richard Simmons donated $20 million dollars to MIT.[2]

166.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to unilaterally repudiate its licensing agreement with Volumetric Imaging, Inc., causing direct injury to Solomon.

167.    In consideration for the $20 million dollars and other consideration, Vest authorized MIT to knowingly promote the fraudulently obtained products of Favalora and Actuality Systems.

168.    In consideration for the $20 million dollars and other consideration, Vest and Morse induced Robert Ryan, Navigator Ventures, Halliburton, Apache Oil to invest in the manufacture of the fraudulently obtained products of Favalora and Actuality Systems.

169.    In a second instance in the period from 2002-2004, TI, in conspiracy with Raytheon and the other Defendants, contracted to supply a high speed shutter system and intentionally to Solomon individually, intentionally supplied a defective product and intentionally obstructed and delayed its perfection.

170.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

---

[1] Teledyne Technologies Annual Report 2003, Pg. 14-15
[2] MIT News, November 17, 1999

## COUNT VIX
## (All Defendants)

### (Scheme to Obtain Trade Secrets)

171.    From 1980 to the present, the Defendants including but not limited to Altman, Wolfson, Plotkin, Ellis, Gadiesh, Mindich, Morse, Teledyne, Raytheon, Texas Instruments, Vest, Actuality and Lightspace, engaged in an unlawful conspiracy to obtain the trade secrets of Solomon by fraudulently inducing Solomon to enter into contracts with the Defendants for goods or services using the U.S. mail and interstate wires.

172.    In 1996, Defendants changed strategy through Mindich, Morse, Gadiesh, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research.

173.    Said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting.

174.    On another occasion, Wolfson unlawfully obtained Solomon's house and automobile keys by conspiring with her repairperson, and transferred the same to other Defendants, in a scheme to obtain detailed research in the truck of Solomon's car.

175.    On another occasion Wolfson schemed to obtain Solomon's trade secrets by obtaining detailed information on the security systems on Solomon's notebook computer and transferring said information to the other Defendants.

176.    The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

## COUNT VI
## (All Defendants)

### (RICO Violence and Threats of Violence)

177.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

178.    In the aforementioned disputes, the Defendants have conspired with persons known and unknown to intimidate Solomon by threats of violence to his person or friends, damage to his property, and assault and battery. The following are major acts of intimidation, assault or theft of trade secrets and other interference with interstate commerce.

179.    On or about January, 1982, during the appeal by the defendants in the first Atlantis litigation, Solomon's co-plaintiff Dean Meledones, suffered two broken legs from a skiing assault by a John Pistilli, whose father had beneficial relations with the Defendants.

180.    Shortly thereafter in March, 1982, Solomon was assaulted in Newton, MA., by a Michael P. White, a participant in the Atlantis Cartel. Twenty-two years later, White was again arrested for assault on his girl friend, within a few miles of Solomon's present residence.

181.    On or about June, 1985, Solomon left Altman Stage Lighting Company in Yonkers, NY for a flight from LaGuardia Airport to Burlington, Vermont where he had planned to meet with Cheney and transfer information related to the futures trading activities of Malloy and others. As he approach the turn-off to the airport, he was struck in the rear by a young female, Jean C. Brana of Jackson Hts, NY with an infant driving an older Cadillac registered to Bio-Medical Clinical Laboratories, Inc., 287 Rockaway Turnpike, Lawrence, NY 11559.

182.    On or about June 1986, the Solomon was assaulted by a John Manley of Falmouth, MA. Mr. Manley later indicated that he was asked by the Atlantis to intimidate the plaintiff. Manley was arrested and accord and satisfaction agreement was reached.

183.    Another criminal act occurred on January 24, 1988 when Solomon, on the invitation of Altman, was struck by a John Thompson of New York, New York, while skiing at Sugarbush Valley, Waitsfield, Vermont. An official report was filed.

184.    Another unlawful act occurred on August 21, 1992 when a William Hennessey of Bridgeport, CN. Struck the plaintiff in the rear on North Road, Chilmark, MA driving a car owned by Edward Wise. A Rachel Wise, daughter of Edward Wise of Chilmark, MA was accompanying Hennessey. An official report was filed.

185.    Another unlawful act of the conspiracy occurred on November, 1992 at the installment of directors of B'nai B'rith when Neosignian Towing, affiliates of the Defendants, of Newton towed the Solomon's car from a lot used by the B'nai B'rith precipitating a confrontation with Boston Police Officer Tracy over photographs of the towing and witnesses. Officer Tracy called in "officer in trouble" resulting in plaintiff's detention. The President of B'nai B'rith who was across the street negotiated a resolution whereby Solomon relinquished his film. No other action was taken.

186.    Another unlawful act occurred on June 16, 1996, when a male identifying himself as a Yonkers Police Officer driving a Chevy van, plate # NY WJJ 865, pushed Solomon from behind while shopping early Sunday morning at Bosun's Marine Store, Mashpee, MA.

187.    On or about August, 1996, Solomon filed a letter complaint regarding Altman with the Boston station of the F.B.I. Shortly thereafter, the incidents of direct assault ceased.

188.    Defendants changed strategy through Mindich, induced Wolfson to engage in schemes to obtain Solomon's trade secrets related to his pending U.S. Patent applications and other research, said acts include, but are not limited to, plying Solomon with liquor at a private dinner with her woman friend, Myra Huff, and suggesting sex in exchange for designs involving TI DMD technology related to displays, 3D and lighting, unlawfully obtaining Solomon's house and automobile keys and transferring same to other Defendants, and obtaining detailed information on the security systems on Solomon's notebook computer.

189.    From 1998 to 2001, Defendants conspired with Plotkin to obtain Solomon's trade secrets by offering secure office space and misappropriating research related to weathergear designs, lighting systems and display technology.

190.    On July 4, 2002, Defendants, though Mindich, engaged in renewed assaults and intimidation including an attempted assault with an automobile in Provincetown, MA prompting Solomon to contact local police.

191.    On August 26, 2004, Defendants caused the operator of a vehicle, plate NY # CPW 3427 to follow, tailgated and intimidate Solomon near his residence in Yarmouth Port, MA.

192.    On or about October 14, 2004 Defendants caused two individuals, one a car dealer named "Cookie", to push and shove Solomon and suggest that he not interfere with Altman, during the performance of the TICKS, a popular comedic, all woman trio, at a restaurant near Solomon's residence in Yarmouth Port, MA.

193.    These events have occurred with greater frequency during critical periods of litigation.

194.    Defendants are engaged in an ongoing unlawful scheme to obtain Solomon's trade secrets. The aforementioned acts caused substantial injury to Solomon's business, property and business reputation.

195.    As a direct result, Solomon has been substantially damaged in an amount greater than $75,000, to be determined at trial.

## COUNT VII
### (All Defendants)

(False Designation – Lantham Act)

196.    Aforementioned paragraphs are incorporated by reference as if stated fully herein.

197.    Defendants are engaged in an ongoing unlawful scheme to mislead the public as to the inventorship and origin of their products.

198.    Actuality engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

199.    Microvision engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said display products.

200.    Altman engaged in a series of fraudulent or misleading statements which have misled the consumer as to the relevant origin, quality, and value of said lighting products.

201.    Vinton, CranBarry and Atlantis Weathergear engaged in a series of fraudulent or misleading statements, including numerous postings to their website, publications to industry press, and publications to the industry buyers, which have mislead the consumer as to the relevant origin, quality, and value of said weathergear products.

202.    As a direct result, Solomon has been substantially damaged in an amount greater than $50,000, to be determined at trial.

## REQUEST FOR RELIEF

203.    Solomon requests a judicial declaration of non-infringement, invalidity, and unenforceability of the patents listed herein.

204.    Solomon requests that this Court award him actual, compensatory and punitive damages for the Defendants' interference in his commercial activities and other unlawful acts, in an amount greater than $75,000, exact amount to be determined at trial.

205.    Solomon requests that this Court enjoin the defendants from engaging in further criminal acts against Solomon, his family and associates, including but not limited to intimidation and schemes to obtain trade secrets.

206.    Solomon requests that this Court grant other relief as it deems just and proper.

207.    Solomon requests a jury trial of all matters.


Respectfully submitted,


Dennis J. Solomon
PO Box 289
Yarmouth Port, MA 02675

EXHIBIT

tabbies   9

# ⬤CBSNEWS.com

# The Patriot Flawed?

Feb. 19, 2004

In the Pentagon's multi-billion dollar arsenal of weapons, one weapon the government has already spent more than $6 billion on has not only had trouble doing what it was designed to do --bring down enemy missiles -- it also does something it was not designed to do.

That weapon is the Patriot missile system. And the thing it's not supposed to do is bring down friendly aircraft.

The Patriot was originally built nearly 40 years ago to shoot down aircraft. But just before the 1991 Gulf War, its manufacturer, Raytheon, modified the Patriot to shoot down tactical ballistic missiles.

When the U.S. and its allies invaded Iraq again last year, the U.S. Army deployed Patriot crews across the battlefield. And it wasn't long before those crews knew they had a problem. **Correspondent Ed Bradley** reports.

On March 23, a British Tornado fighter jet with two men aboard took off from Kuwait. It was the third day of the war, and there was no Iraqi opposition flying.

Their flight should have gone off without a hitch, according to retired Air Vice Marshall Tony Mason, who is advising a British Parliamentary inquiry into what happened next: "They had fulfilled their mission and they were returning without weapons back to base."

Mason says the aircraft was in friendly airspace when it was destroyed by a Patriot missile.

The explosion lit up the sky over Kuwait and killed the two airmen aboard the Tornado. The next morning, soldiers recovered their bodies, and what was left of their plane. U.S. Army commanders explained the Patriot had mistaken the Tornado for an enemy missile, and said the cause might be a computer "glitch."

"If the system is confusing missiles with planes, that is just not just a minor glitch," says Mason. "The two are so different, that it's difficult really to imagine a system could do that."

But the Patriot isn't like most weapons systems: it's almost completely automatic. Its radar tracks airborne objects. Its computer identifies those objects, and then displays them as symbols on a screen. And if the Patriot displays the symbol for an incoming ballistic missile, its operator has just seconds to decide whether to override the machine, or let it fire.

But Patriot computers were doing some strange things in this war, as reporter Robert Riggs from the Dallas station KTVT was surprised to learn when he was embedded with Patriot batteries.

"This was like a bad science fiction movie in which the computer starts creating false targets. And you have the operators of the system wondering is this a figment of a computer's imagination or is this real," says Riggs.

"They were seeing what were called spurious targets that were identified as incoming tactical ballistic missiles. Sometimes, they didn't exist at all in time and space. Other times, they were identifying friendly U.S. aircraft as incoming TBMs."

And it wasn't only Riggs' battery that had this problem. A U.S. Army report says "various Patriot locations throughout the theater" were identifying "spurious TBMs" -- tactical ballistic missiles that didn't exist.

Usually, the Patriot computers corrected these mistakes on their own. But sometimes they didn't.

"We were in one of the command posts. And I walked in and all the operators and officers are focused intently on their screens. And so you know something's going on here," says Riggs. "And suddenly the door flies open, and a Raytheon tech representative runs in and says, 'Don't shoot! Don't shoot!' Well, that got our attention real quick."

On March 25, a U.S. Air Force pilot flying an F-16 fighter jet got a signal that he was being targeted by radar he believed was coming from an enemy missile system. He fired one of his own missiles in self-defense and hit the system that was tracking him -- not an enemy, but the Patriot battery where Riggs was reporting.

"Suddenly, my whole field of vision is just-becomes white light. We all thought we were under Iraqi mortar attack," says Riggs. "We had no idea this is the good guys shooting at us."

"There was no way that Patriot system should have still been up and running, targeting aircraft. They should have stood down, knowing that they had a fatal problem on their hands," says former Congressional investigator Joseph Cirincione.

Cirincione says the Army has known the Patriot had serious problems since at least 1991, when Congress appointed him to lead an investigation of the Patriot's performance in the first Gulf War, a performance that had looked spectacular on network news programs.

"I saw the pictures. I thought this is amazing. This system is exceeding expectations," says Cirincione. "And all during the war, that's what I thought. This was what all the newscasters said it was -- a Scud buster, a miracle weapon."

And it wasn't just newscasters who said so. This is what President George Bush had to say when he visited Raytheon headquarters during the First Gulf War: "The Patriot works because of Patriots like you, and I came again to say thank you to each and every one of you!"

"A lot of money started flowing into the Patriot right after the Gulf War, because everybody thought it was a success," says Cirincione.

But it turns out, that wasn't true. Almost none of the Patriots had worked. Some of them had failed to hit the incoming Scuds. Some had shot at missiles that didn't even exist. But most of them still exploded in the sky, leading everyone to believe they'd scored a kill, when in fact they hadn't.

"The best evidence that we found supports between two and four intercepts out of 44," says Cirincione. "About a 10 percent success rate."

Cirincione said the Army responded angrily to his findings: "The Army insisted that they knew they had some problems with the Patriot, but it didn't serve any purpose to make these public. We would just be aiding the enemy. And that they would take care of it in the course of normal product improvement."

But why would the Army do this? Why is this system so important to them that they would ignore evidence presented by a committee sent by the Congress to investigate it?

"The Patriot is a multi-billion dollar system. There's a lotta money involved. There's a lotta careers involved," says Cirincione, who says the Army continued to claim that the Patriot was a success after he presented them with his findings.

And they kept claiming success until 2001, when the Pentagon finally admitted the Patriot hadn't worked in the First Gulf War. By then, the Patriot had an even more disturbing problem. On the test range, it kept targeting friendly planes. And the man who oversaw those tests from 1994 to 2001 was former Assistant Secretary of Defense Phillip Coyle.

The tests, according to Coyle, included pilots flying real planes and soldiers operating the Patriot missile system. And Coyle says that if they had been using real missiles, they would have shot down friendly planes.

Pentagon, Army and Raytheon officials all declined to talk with *60 Minutes* on camera, but a 1996 Pentagon report said the Patriot had "very high 'fratricide' levels" in the early '90s. In other words, in tests it often tried to shoot down friendly planes.

And the military has since confirmed news reports that Patriots with simulated missiles had problems with "friendly fire...in exercises in 1997, 2000, and 2002" -- including one instance when a Patriot with simulated missiles would have, if its missiles had been real, "shot down an entire four-ship formation of F-16's."

Would the people who ran the Patriot system have been aware that there were problems in misidentifying planes?

"They certainly should have been. I believe they were. But the focus was on hitting a target. Other issues, such as friendly fire, didn't get the same -- either spending, or priority, as the first priority of hitting a target," says Coyle.

Cirincione says that's not surprising: "There's a tendency in all our weapons systems to try to play up the good news and get it through its performance evaluations, and then try to fix the problems later on."

Even if it threatens American and coalition lives?

"Well, they never think of it that way. They think that it's a problem with the system that they can fix down the line," says Cirincione.

But they didn't fix it. Yet, when the U.S. declared war on Iraq last spring, U.S. Army commanders said the Patriot was ready for combat.

"What's so disheartening about this is the very things we warned about came to pass in this war," adds Cirincione. "It's clear that the failure to correct some of the problems that we've known about for 10, 12 years led to soldiers dying needlessly. To flyers, dying needlessly."

On April 2, U.S. Navy Pilot Lt. Nathan White took on his 14th mission of the war. It had been 11 days since the Patriot had shot down a British Tornado fighter jet, and nine days since it had threatened an F-16.

Lt. White took off from the deck of the U.S.S. Kitty Hawk into skies being scanned by Patriots. Navy officials told his father, Dennis White, what happened that night.

"They had finished their mission and had climbed out and were flying back to the Kitty Hawk," says White.

Lt. White's mission was finished and he was on the way home when a Patriot system, on the ground below, identified his plane as an enemy missile and fired two missiles.

"He radioed the lead that he saw them. And as he turned he said they're tracking," recalls White. "He turned. They turned. They followed him ... They told me it was probably within four seconds when it was all over with."

It was a direct hit. Lt. White's body was recovered 10 days later.

The Patriot had 12 engagements in this war -- three of them with our own planes. Since then, U.S. military commanders have often claimed the Patriot hit "nine for nine" of the enemy missiles it targeted. But they still haven't produced a report explaining the incidents of friendly fire.

"You don't get promoted for reporting bad news," says Cirincione. "What that means is people turn aside -- and I mean just about everybody in the program will turn aside from the bad news in order to keep the program going, keep the appearance of success."

This year alone, the Pentagon will spend more than a billion dollars on the Patriot program. And Raytheon is selling more and more Patriots to countries in Asia, the Middle East, and Europe.

© MMIII, CBS Worldwide Inc. All Rights Reserved.





EXHIBIT

2

February 14, 1991

Mr. Dennis J. Solomon
1 Kendall Sq. Suite 2200
Cambridge, MA   02139

Dear Mr. Solomon:

At present, we are unable to justify further discussions of licensing or other ventures with Volumetric Imaging, Inc.

In the future we may wish to reconsider; and we do appreciate your interest in Texas Instruments.

Very truly yours,

Gary C. Honeycutt
Division Patent Counsel
Texas Instruments Incorporated
P. O. Box 655474, MS 219
Dallas, Texas 75265
(214) 995-1363

GCH:hw

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)  Solomon v Vest

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    ___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ✓    II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

    ___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

    ___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

    ___  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in
    this district please indicate the title and number of the first filed case in this court.

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                    YES            NO     ✓

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See
    28 USC §2403)

                                                                    YES    ✓       NO     ✓

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                    YES            NO

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                    YES            NO

7.  Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule
    40.1(d)).

                                                                    YES    ✓       NO

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division    ✓          Central Division                Western Division

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
        agencies,  residing in Massachusetts reside?

        Eastern Division               Central Division                Western Division

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If
    yes, submit a separate sheet identifying the motions)

                                                                    YES            NO     ✓

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Dennis J Solomon

ADDRESS  PO Box 289, Yarmouth Port, MA 02675

TELEPHONE NO.  508 394 9221

(Coversheetlocal.wpd  - 10/17/02)

CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Dennis J. Solomon

**DEFENDANTS**

Charles Vest

**(b)** County of Residence of First Listed Plaintiff    Barnstable
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    Middlesex
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

PO Box 289
Yarmouth Port, MA 02675
^ 508 394 9221

Attorneys (If Known)

**II. BASIS OF JURISDICTION**    (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 362 Personal Injury | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 365 Personal Injury |    of Property 21 USC |  | ☐ 450 Commerce-ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of |    Slander   ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck |  | ☐ 470 Racketeer Influenced and |
| ☐ Judgment / Medicare Act | ☐ 330 Federal Employers'      Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights |    Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |    Liability      Liability | ☐ 660 Occupational | ☒ 830 Patent | ☐ 810 Selective Service |
|    Student Loans | ☐ 340 Marine    **PERSONAL PROPERTY** |    Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
|    (Excl. Veterans) | ☐ 345 Marine Product   ☐ 370 Other Fraud | ☐ 690 Other |  |    Exchange |
| ☐ 153 Recovery of Overpayment |    Liability   ☐ 371 Truth in Lending |  | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 380 Other Personal | **LABOR** |  |    12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle      Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract |    Product Liability   ☐ 385 Property Damage |    Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury      Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**  **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
|  |  |    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting   ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** |    Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment      Sentence |  |  | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/      Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff |    Determination Under Equal Access to |
| ☐ 240 Torts to Land |    Accommodations   ☐ 510 General |  |    or Defendant) |    Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare   ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights   ☐ 540 Mandamus & Other |    Security Act |    26 USC 7609 |    State Statutes |
|  |    ☐ 550 Civil Rights |  |  | ☐ 890 Other Statutory Actions |
|  |    ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN**    (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 USC 2201-01, 18 USC 1831; Request of Declaratory Judgement on U.S. Patents

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**    (See instructions):

JUDGE

DOCKET NUMBER

11/09/04