UNITED STATES DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

DENNIS J. SOLOMON, Plaintiff

v.   Civil No: 04-12499WGY

CHARLES VEST,
et al., Defendants

### Plaintiff's Opposition To Defendant Texas Instruments' Motion To Dismiss For Failure To State A Claim Of March 22, 2005

The plaintiff, Dennis J. Solomon, a scientist with no formal legal training, brings this action pro se due to the high cost of retaining counsel and his present financial condition, largely a result of the defendants unlawful acts.. He opposes defendant Texas Instruments motion to dismiss the complaint for failure to state a cause of action.

The standard for evaluating a pro se complaint in the 1st Circuit has been established by Ahmed v Rosenbatt, 94 F.3d 721, 731 (1st Cir. 1996) where the court stated that:

> "Our judicial system zealously guards the attempts of pro se litigants on their own behalf. We are required to construe liberally a pro se complaint and may affirm its dismissal only if a plaintiff cannot prove any set of facts entitling him or her to relief. See Rockwell v. Cape Cod Hosp., 26 F.3d 254, 255 (1st Cir. 1994). However, pro se status does not insulate a party from complying with procedural and substantive law. See Eagle Eye Fishing Corp. v. United States Dep't. of Commerce, 20 F.3d 503, 506 (1st Cir. 1994). The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."

Defendant Texas Instruments, Inc. has moved to dismiss the complaint on the grounds that the complaint fails to allege the specific acts which, if proven, would

constitute grounds to relief. TI argues that fraud must be pled with particularity including: 1) the specific misrepresentations, 2) the intent to deceive, 3) materiality, 4) reasonable reliance on fraud by plaintiff; and 5) injury to plaintiff; civil conspiracy with the coercive acts in unison; breach of contract with the specific contract, breach and injury; and civil RICO with the proscribed criminal violations and the existence of an ongoing enterprise. Commercial disparagement, and interference with existing and prospective business relations were not separately discussed.

While the complaint alleges specific acts, the allegations with regard to Texas Instruments are dispersed throughout. For clarity and conciseness, the allegations and facts are restated herein with specific relation to defendant Texas Instruments.

## 1. Background Facts Alleged

The Plaintiff, Dennis J. Solomon, has participated in the development of "state-of-the-art" computerized imaging, identification and tracking systems since the late 1970s. During the 1980s, Solomon filed was awarded three U.S. Patents which became the foundation to the most advanced imaging, tracking, and identification system used for certain groups within the United States Department of Defense. In the early 1990s, Solomon was invited and agreed to publicly present a paper on the applications related to air traffic control and related defense requirements.

As a result of the publication, Solomon was asked to submit a response to a major acquisition program for air traffic control systems. Solomon's company, Volumetric Imaging, Inc., was listed as a first-tier developer of the requisite systems. Texas

Instruments was among the five competing firms. Defendants Raytheon and Texas Instruments attended the proposers' meeting.

Shortly thereafter Raytheon contacted Solomon and offered to submit a joint proposal. Solomon accepted. Up to the day prior to the submission of the proposal, Raytheon and Solomon communicated almost daily, and Raytheon transmitted all the necessary contract documents which Solomon signed. Solomon was told the submission copy would be made by Raytheon's Pentagon office.

For almost two weeks following the deadline, Raytheon refused to accepted Solomon's call. Finally, a project engineer was given the responsibility to tell Solomon that the evening before the deadline, Raytheon decided to team with Texas Instruments instead.

During the next ten years, Solomon, MIT Professor Theodore Postol, a number of Congressional investigators, and at least one Deputy Secretary of Defense complained that the system developed by Raytheon and Texas Instruments, Inc. was fatally flawed and that their management refused to acknowledge or correct the deficiencies. These complaints were met with a barrage of effective political and legal arm-twisting, and no corrections were implemented.

During the Iraq War of 2003, out of 23 objects targeted, the tracking system of the Patriot missile targeted at least seven friendly fighter jets, and murdered three Allied fighter pilots.

From 1998 to the present Raytheon and Texas Instruments have engaged in an ongoing competition with Solomon by assisting and supporting the development of the

Actuality Systems Volumetric Display which they knew was a copy of a design I submitted to Raytheon in 1992.

## II. Facts Alleged Giving Rise to the Present Causes of Action

1. In the summer of 2001, Solomon presented his competitive volumetric technology at the SIGGRAPH conference in Los Angles, CA.

2. During the conference, Texas Instruments' employee Dana Dudley, approached Solomon and proposed that Texas Instruments would "fully and enthusiastically support Solomon's further development" of a TI DMD-based Volumetric Display.

3. Solomon communicated to Dudley that Solomon required precision DMD mirror control at a minimum frequency of 4 KHz, and equal terms to TI best DMD customers in order to commit to the DMD project. Dudley agreed.

4. Dudley proposed that Solomon and TI execute a non-disclosure agreement and that Solomon convey to TI and its associates confidential trade secret information related to Solomon's inventions and designs under the terms of said agreement. The parties executed said and subsequent written agreements on or after February, 2002.

5. Dudley also proposed that Solomon purchase a TI DMD Discovery Board and a supporting interface card from Defendant Productivity Systems, Inc., a TI controlled shadow corporation, founded by TI employees.

6. Dudley also proposed that Solomon convey his trade secrets to Brilliant Engineering, Inc., a TI employee company, which Solomon discovered was

comprised of former Raytheon employees involved in the Raytheon-TI volumetric project.

7. Solomon based his subsequent development of the TI DMD based on Dudley's representation that TI would provide full and enthusiastic support, including access to all DMD materials and data provided other competitors. Further, Dudley authorized Becky Bell of PSI and Tyrex to oversee said projects and report directly to Dudley.

8. Based on Dudley's representation, from the year 2001 to the present, Solomon purchased and paid for $25,000 of TI Discovery products for this project.

9. Based on Dudley's representation, from the year 2001 to the present, Solomon committed and expended over $250,000 of consultant and project time to the development of the TI DMD project.

10. Based on Dudley's representation, from the year 2001 to the present, Solomon responded to inquiries for numerous clients and prospective clients including the Boeing Corporation.

11. The Boeing Corporation offered to fund at least $2,000,000 towards the development of a cinematic size Solomon DMD display if a prototype demonstration could be made by early 2003. Based on Dudley's representation, Solomon agreed to develop and present said display.

12. Based on Dudley's representation, from the year 2001 to the present, Solomon committed over $50,000 in direct and related expenses to a presentation of the Solomon TI DMD display at SIGGRAPH 2003.

13. During the period for 2002 to the present, Dudley, Bell and others represents that the Based on Dudley's representation, from the year 2001 to the present, Solomon committed over $50,000 in direct and related expenses to a presentation of the Solomon TI DMD display at SIGGRAPH 2003.purchased and paid for $25,000 of TI Discovery products for this project.

14. In early 2004, TI ordered the bankruptcy of PSI as part of a scheme to defraud Solomon and others who relied on TI's direct representation. All the physical assets were delivered to TI and TI directed the development of a second TI Discovery operation under the corporate shell of Tyrex Systems, Inc.

15. In 2004, Dudley and Bell fraudulently induced Solomon to return his TI Discovery under the pretense that it would be upgraded and outfitted with a USB board marketed by Tyrex.

16. Solomon returned his TI Discovery board to Tyrex. He was subsequently told the DMD was defective and had to be sent to TI.

17. Shortly thereafter, Solomon was contacted by attorney Killeen of Holland & Knight who instructed Solomon to communicate solely with him regarding TI matters. Solomon requested confirmation by the TI authority. Killeen refused to provide the name of any authorizing individual.

18. Thereafter, Dudley, Bell and others at TI and Tyrex refused to respond to Solomon's inquiries.

19. During the entire relevant period, TI secretly provided Actuality with detailed precision boards to enable the operation of the DMD in a manner requested by Solomon.

20. During the entire relevant period, TI had at its disposal an operational DMD system which TI could have loaned to Solomon for demonstration purposes.

21. TI, PSI, Tyrex, and Dudley, acting on instructions from her superiors intentionally induced Solomon to purchase TI Discovery and related products, and expend considerable funds developing a TI DMD product, by misrepresenting:
    a. the performance of TI-PSI products;
    b. the schedule of improvements to the TI-PSI;
    c. the availability of precision DMD demonstrators;
    d. TI's commitment to make precision DMD products available to Solomon;
    e. TI's commitment to make competitive DMD products available to Solomon;
    f. TI's willingness to make compatible products available;
    g. The condition of Solomon's TI purchased products.

22. TI, PSI, and Tyrex made said misrepresentations with the intent to deceive and defraud Solomon to purchase TI products and service, and commit substantial sums of money and time to the development of TI DMD products.

23. Solomon relied on the misrepresentations made by TI, PSI and Tyrex, which were material and essential to his decision-making.

24. Solomon experienced substantial damages as a direct result of the misrepresentations of TI, PSI and Tyrex including but not limited to:
    a. being defrauded of at least $25,000 in cash
    b. expending at $35,000 in directly related expenses,

    c. committing and expending at least $250,000 in staff salaries and equivalents in the project development;

    d. the loss of at least $2,000,000 in client contracts;

    e. a diminution of business reputation in the SIGGRAPH and government community;

    f. and other ascertainable financial losses.

25. TI, PSI and Tyrex held exclusive and coercive control of the manufacture and distribution of TI DMD products, and acted in unison to bar Solomon for receiving fully functionally units.

26. During the relevant period, defendant Raytheon held an exclusive license to and manufactured defense-certified displays using the TI DMD products. TI breached its NDA contract with Solomon by providing and causing Raytheon to be provided with protected details of Solomon's designs and strategies.

27. Dana Dudley, and other employees and agents of TI, PSI, and Tyrex disparaged and interfered with the prospective business relations of Solomon by intentional and falsely communicating to superiors within TI, Boeing and the U.S. Air Force that Solomon was unreasonable in his business conduct.

28. TI, PSI and Tyrex entered into a series of explicit and implicit contracts with Solomon to provide him with two fully-functioning TI DMD / Interface systems. Said contracts were communicated interstate by US mail and wire, and acceptance evidenced by the retention of funds and other writings. TI, PSI and Tyrex entered into the contract in bad faith, and intentionally breached said contract by failing to deliver said fully-functional units as contracted.

29. TI conspired with defendants Raytheon, Vest, and Actuality, using interstate wires and at meetings in the Commonwealth, in a scheme to obtain Solomon's trade secrets through fraud, misrepresentation, and unlawfully entry into Solomon's computers.

30. TI conspired with defendants Raytheon, Vest, and Actuality, using interstate wires and at meetings in the Commonwealth, to delay and obstruct the presentation of Solomon's superior display technology by using misrepresentation of their willingness to supply and support Solomon regarding the TI DMD / Interface Systems to induce Solomon to commit substantial amounts of funds and time to develop a product and then refusing to provide said fully-functional DMD/Interface unit.

31. As part of said conspiracy to unfairly compete, TI, Raytheon, and Vest intentionally provided Actuality with timely support, functional TI DMD / Interface systems, public statements of support, false advertising claiming Actuality as the inventor of Solomon's technology, marketing, references and assistance in U.S. government contracts and other things and assistance of value, when they knew said Actuality technology was unlawfully misappropriated from Solomon.

### III. Summary

The aforementioned paragraphs 21-31 address with specificity the defendants' requirements for an acceptable complaint based on misrepresentation, breach of contract, fraud, commercial disparagement, unfair competition, misappropriation of trade secrets and civil RICO, as described in their motion to dismiss. Moreover, where the

encompassing cause of action of complaint is an unlawful conspiracy to unfairly compete, it is well established that a plaintiff may state an unfair competition claim based upon an allegation that the defendants did not develop their product or competitive advantage by *"fair and honest means"* Chicago Lock Co. v. Fanberg, 676 F.2d 400, 404 (9th Cir. 1982), IMAX Corporation v. Cinema Technologies, Inc., 152 F.3d 1161 (Ct. App. 9th Cir., Aug. 19, 1998). This allegation is explicitly and succinctly alleged in the present complaint.

It is interesting to note that TI could have obviated the need for this litigation by timely providing two fully-functional units having a component and assembly cost of less than $5,000 – functional units which they had in stock prior to the filing of this complaint. Instead they chose the well-known Litton v Honeywell strategy of defense contracting – *annihilate your competition at dawn*. As was the case there, our Nation's security suffered, and eventually, so did the wrongdoer. This would be the proper outcome here.

Therefore, I, Dennis J. Solomon, plaintiff pro se, respectfully request this court to deny defendant Texas Instruments' motion to dismiss and to incorporate the restated averments into the complaint where deemed useful for complying with the requirement for a "short and concise statement" of the causes of action.

Respectfully submitted on this day, April 4, 2005.

Dennis J. Solomon
PO Box 289,  Yarmouth Port, MA 02675
508 394 9221,   djs.vest@citizenslaw.org

CERTIFICATE OF SERVICE: I certify that I served a copy of this document upon the responding defendants by first class or electronic mail as agreed by the parties on April 4, 2005.